**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

**RYAN E. MILLER,**                                    :

    **Plaintiffs**                             :        **CIVIL ACTION NO. 3:17-0771**

    **v.**                                           :                **(JUDGE MANNION)**

**C.O. MACHOGA, et al.,**                      :

    **Defendants**                           :

**MEMORANDUM**

**I. Background**

    Plaintiff, Ryan E. Miller, an inmate currently confined at the Benner State Correctional Institution, Bellefonte, Pennsylvania, filed the above caption civil rights action pursuant to 42 U.S.C. §1983. (Doc. 1). He complains of an event that occurred at his former place of confinement, Mahanoy State Correctional Institution ("SCI-Mahanoy"), Frackville, Pennsylvania. Id. The named Defendants are the following SCI-Mahanoy employees: C/O Brett Machuga, C/O Christopher Swartz, C/O Robert Evans, C/O Robert Gee, C/O Brandon Reigh, C/O Jesse Flannery, Lt. Donald Rakus, Lt. Kevin Clark, Security Lt. Thomas Biscoe, Counselor Harry Carodiskey, Superintendent Theresa DelBalso, Deputy

Superintendent   Bernadette   Mason,   Deputy   Superintendent   Luke Cronauer, and Margaret Ward, R.N. Id.

Plaintiff seeks compensatory and punitive damages for an incident which allegedly occurred on December 14, 2016, wherein Miller asserts that certain Defendants assaulted him after he set fire to his cell and other named Defendants failed to intervene during the alleged physical assault. Id.

Specifically, Plaintiff claims that he "was told to exit his cell" and when he "exited and was brought to the ground upon the handcuffs being put on [he] told [Officer Machuga] that they were too tight" and "he started choking me and said, 'is this to tight' and punched me in the face repeatedly until was unconscious using excessive force," and "[his] face completely batured (sic)." Id. Plaintiff claims that he was "then awoken by the handcuffs cutting off circulation in [his] hand." Id. He states that "medical took photos and documented all" and that "all was done on video" and "at no time was [he] resisting." Id.

Plaintiff further alleges that CO Swartz "violated [his] 8th Amendment right to be free from cruel and unusual punishment by kneeing [him] in the face while walking to the triage room" and "when [he] asked him to stop

2

using so much force on [his] wrists [he] shoved [him] onto the triage room bed, leaving a gash and bruise." Id. Again, Plaintiff claims "at no time was [he] resisting." Id. Plaintiff states that Correctional CO Gee used excessive force "by covering [Plaintiff's] running bloody nose and mouth with [Plaintiff's] thermal top [he] was wearing, causing [Plaintiff] to not be able to breath." Id. Plaintiff claims he "asked him multiple times to remove it, telling him [he] can't breathe." Id. Plaintiff believes this was "done as a means of torturing counter measure." Id. Plaintiff claims that the remaining Defendants failed to intervene and failed to report their fellow officers for using excessive force. Id.

Presently before the Court is Defendants' motion for summary judgment. (Doc. 35). The motion is fully briefed and is ripe for disposition. For the reasons set forth below, this Court will grant Defendants' motion for summary judgment.

## II.   **Summary Judgment**

Federal Rule of Civil Procedure 56(a) requires the court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. Id. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 257; Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am., 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consol. Rail Corp., 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Electric Co., 862 F.2d 56, 59 (3d Cir. 1988). To avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party

4

seeking summary judgment satisfies its burden under Rule 56 of identifying evidence which demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56 to go beyond his pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986). When Rule 56 shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323. See Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992).

In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. White, 862 F.2d at 59. In doing so, the Court must accept the nonmovant's allegations as true and resolve any conflicts in his favor. Id.

5

(citations omitted). However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." L.R. 56.1.  A party cannot evade these litigation responsibilities in this regard simply by citing the fact that he is a *pro se* litigant. These rules apply with equal force to all parties. See Sanders v. Beard, No. 09-CV-1384, 2010 WL 2853261, at *5 (M.D. Pa. July 20, 2010) (*pro se* parties "are not excused from complying with court orders and the local rules of court"); Thomas v. Norris, No. 02-CV-01854, 2006 WL 2590488, at *4 (M.D. Pa. Sept. 8, 2006) (*pro se* parties must follow the Federal Rules of Civil Procedure).

Significantly, where events at issue have been captured on videotape, as is the case here, the court must consider that videotaped evidence in determining whether there is any genuine dispute as to material facts. See Scott v. Harris, 550 U.S. 372, 380-81 (2007).  The court

must view the facts in the light depicted by the videotape. See id. (relying on a videotape in assessing summary judgment evidence and admonishing that the lower court "should have viewed the facts in the light depicted by the videotape.").

### III.    Statement of Undisputed Facts

On December 14, 2016, Plaintiff was incarcerated in the Restrictive Housing Unit ("RHU") at SCI-Mahanoy. (Doc. 37-2, Miller Deposition). The alleged incident began at approximately 1:30pm on December 14, 2016. Id. On that date and time, Plaintiff wanted to go to "group" so that he could watch television and "hang out." Id. Defendant C.O. Machuga would not let Plaintiff go to group. Id. This made Plaintiff "very angry." Id. In fact, it caused Plaintiff to "act out" by lighting his trash can and blanket on fire. Id. Plaintiff set the fire with a lighter. Id. The purpose of lighting the fire was to "say[] like you're not going to burn me and get away with it." Id. Before lighting the fire, Plaintiff covered the windows of his cell in order to draw the attention of corrections officers. Id. Then "[he] got the lighter out, put the trash can near [his] door and blanket, and lit it on fire." Id. He lit the fire

"right next to [the door]." Id. The reason Plaintiff set the fire was to "get attention and make [the corrections officers'] jobs hard." Id.

The incident is captured on both closed-circuit and handheld video. (Doc. 37-7). The closed-circuit video depicts three officers initially responding to flames coming out of the wicket in Plaintiff's cell door. Id. The officers can be seen dragging a hose over to the cell door and putting it through the wicket to extinguish the fire. Id. Additional officers join in to help. Id. Once the fire was extinguished, Plaintiff's cell door was opened. Id. Plaintiff proceeded to rush or "charge" through the cell door into the officers. Id. Corrections officers struggled to restrain Plaintiff, who was being combative. Id. At no point in time does the video depict any officer striking Plaintiff or using excessive force against him. Id. Once Plaintiff was successfully restrained, he was escorted to the RHU triage room to be seen by medical. Id.

Once Plaintiff was escorted to the triage room, the video changes over to a handheld video with audio. Id. In the triage room, Plaintiff was placed face down on the medical bed located in the room. Id. Once Plaintiff was placed on the bed, C.O. Flannery had to control Plaintiff's legs due to Plaintiff's combative behavior, including kicking. Id. Once C.O. Flannery

8

deemed that it was safe to release Plaintiff's legs, he did so. Id. C.O. Evans was responsible for securing Plaintiff's left shoulder while he was on the medical table. While Plaintiff's legs were secured on the medical table, Plaintiff complained about not being able to breathe. Id. In response, the Lieutenant in the room said "alright," moved to the right side of the medical table and told officers to "get the noose off [Plaintiff's] neck." Id. The "noose" was a sheet or a pillowcase that Plaintiff placed around his face before setting the fire, so that he could breathe without inhaling smoke. (Doc. 37-2, Miller Deposition). Corrections officers removed the sheet from around Plaintiff's neck while he was in the triage room. (Doc. 37-7, handheld video). Once the sheet was removed, Plaintiff's breathing became more regular, and he relaxed on the medical table. Id. After the sheet was removed from Plaintiff's neck, he began to complain about something being on his face. Id. An officer is heard saying, "…you spit," and the officer then explains that Plaintiff's mouth was temporarily covered with the top collar of Plaintiff's thermal shirt to prevent Plaintiff from spitting. Id. Plaintiff continued to complain about not being able to breathe, yet he was talking and yelling through most of the time he spent in the

triage room. Id. Finally, Plaintiff can be heard saying "I'm done resisting." Id.

While in the triage room, Plaintiff asked for more room to move. Id. An officer responded by saying, "you just assaulted officers and now you want room to move." Id. Plaintiff responded, "I didn't hit anybody...I mighta charged ya, I didn't hit ya...". Id. Plaintiff then admitted to "tackling" a corrections officer and to setting the fire in his cell, indicating that the lighter was still in his pants. Id. The officers then removed the lighter from Plaintiff's pants. Id.

Margaret Ward, R.N. treated Plaintiff in the triage room. Id. Plaintiff complained of pain to his right wrist, but no treatment was required. Id. Nurse Ward tended to a small cut on the right side of Plaintiff's forehead. Id. After being treated and having photos taken, Plaintiff was escorted out of medical triage to a cell. Id. After securing the door of the cell, staff then removes Miller's handcuffs. Id. Staff then exit the area, and the camera operator remains at Miller's cell door for approximately five additional minutes. Id. Although Miller continues to yell through the cell door that he is "all beat up," that the officers hit him "like six times" and "broke both [his] thumbs," he holds his wrists at the window of the cell door and only a small

10

red mark on each wrist is visible as well as a small cut on his head. Id. The camera operator then leaves the cell door and walks into a hallway to his right where a debriefing is conducted. Id. All officers reported their equipment was intact. Id. Defendants' affidavits in support of their motion for summary judgment reveal that Defendants Machuga, Swartz, Evans, Gee, Flannery, were the named Defendants who responded to the fire in Plaintiff's cell. (Doc. 37). Correctional Officer Reigh was responsible for video-recording the events that transpired in the triage room. Id.

## IV. DISCUSSION

Plaintiff has brought his Eighth Amendment excessive force claim pursuant to 42 U.S.C. §1983, which provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

"To establish a claim under 42 U.S.C. §1983, [a plaintiff] must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed by a

person acting under color of state law." Moore v. Tartler, 986 F.2d 682, 685 (3d Cir. 1993). "The first step in evaluating a section 1983 claim is to 'identify the exact contours of the underlying right said to have been violated' and to determine 'whether the plaintiff has alleged a deprivation of a constitutional right at all'." Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998)).

### A. **Excessive Force Claim**

The cruel and unusual punishment clause of the Eighth Amendment protects inmates against the application of excessive force by correctional officers. See Whitley v. Albers, 475 U.S. 312, 318–19 (1986). In an excessive force claim, the core judicial inquiry is not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. Wilkins v. Gaddy, 559 U.S. 34 (2010). In applying this test, courts are tasked with considering the following factors: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as

reasonably perceived by the responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response. Id.

The reasonableness of a particular use of force is often dependent upon the relevant factual context and must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386, 396-97 (1989); see also Fuentes v. Wagner, 206 F.3d 335, 346 (3d Cir. 2000) ("[E]ven if we concede [that an inmate] has established at most that prison officials overreacted to the disturbance that he caused . . . any such over-reaction would still fall short of supporting a finding that prison officials acted 'maliciously and sadistically to cause harm.'"). Additionally, *de minimis* use of physical force does not qualify as excessive force unless the force is "repugnant to the conscience of mankind." Brooks v. Kyler, 204 F.3d 102, 107 (3d Cir. 2000) (citing Hudson, 503 U.S. at 6); see also Wilkins, 559 U.S. 34 (clarifying that *de minimis* force, rather than *de minimis* injury, is the dispositive issue). Not "every malevolent touch by a prison guard gives rise to a federal cause of action." Hudson, 503 U.S. at 9. To that end, when "it appears that the evidence, viewed in the light most favorable to the

13

plaintiff, will [not] support a reliable inference of wantonness in the infliction of pain," summary judgment is appropriate. Brooks, 204 F.3d at 106 (quoting Whitley, 475 U.S. at 322).

Conversely, "when prison officials maliciously and sadistically use force to cause harm…contemporary standards of decency are always violated . . . whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." Wilkins, 559 U.S. at 37 (quoting Hudson, 503 U.S. 1).

Here, the surveillance video, without audio, commences with three Officers approaching Plaintiff's cell, assessing, retreating, and returning with a hose to extinguish the fire through the wicket. Additional officers join the original officers. Once the fire is extinguished and the hose is removed from the wicket, the officers open the door and through the smoke it can be seen that Plaintiff rushes forward into the officers. The video reveals that the officers quickly restrained Plaintiff and escorted him to the triage room.

The videotape evidence clearly demonstrates that Defendants resorted to force to effect compliance only after Plaintiff rushed the

officers. It also reveals that Defendants fully comported with the directives contained in DC-ADM 201 which authorizes use of force against an inmate when a staff member reasonably believes such force is necessary to protect oneself or others and/or to effect compliance with the rules and regulations when other methods of control are ineffective or insufficient.

As concerns the relationship between the amount of force used and efforts made to temper the severity of a forceful response, the video shows a consistent and measured application of force by Defendants to quell Plaintiff's aggressive manner and to regain control of the situation. It does not portray any Defendant striking Plaintiff in the face or on his head, thereby dispelling Miller's assertions that Defendants pushed, kicked, and punched Plaintiff. It also demonstrates that Defendants' actions complied with the DC-ADM 201 directive that when force is used, the least amount of force the staff member reasonably believes is necessary to achieve the authorized purpose is to be used. See DC-ADM 201, Section III(B). Also, importantly, once the Plaintiff was placed on the floor, the application of force immediately ceased. Id. (stating that "the use of force must stop once control is achieved").

15

Finally, Plaintiff suffered a small superficial laceration to the top of his head. (Doc. 37-7). He was able to move, flex and extend the fingers, bilateral hands, and wrists. Although it is not required that he show more than a *de minimis* injury, see Wilkins, 559 U.S. at 39 (clarifying the notion that a significant injury is a threshold requirement for stating an excessive force claim was rejected in Hudson, 503 U.S. at 7), the "absence of [a] serious injury" nevertheless remains relevant in an Eighth Amendment inquiry. Id. at 40 (noting that the extent of injury may provide some indication of the amount of force applied, and stating that "[a]n inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim") (citing Hudson, 503 U.S. at 9 (internal quotations omitted).

Where a videotape refutes an inmate's claims that excessive force was used against him, and the video evidence does not permit an inference that prison officials acted maliciously and sadistically, summary judgment is entirely appropriate. See Tindell v. Beard, 351 F. App'x 591 (3d Cir. 2009). The video footage of this incident would lead a reasonable trier of fact to find that Defendants used the amount of force necessary to bring Plaintiff into compliance. Id. at 596; see also, Whitley, 475 U.S. at

16

319; Fuentes v. Wagner, 206 F.3d 335, 346 (3d Cir. 2000) (noting that even a prison officer's "over-reaction" to an inmate-caused disturbance would fall short of supporting a finding of excessive force where the totality of the circumstances indicated that the force was applied in a good faith effort to maintain order). No aspect of the video, or any other portion of the record, supports an assertion that Defendants Machuga, Swartz, Evans, Gee, Flannery or Reigh acted maliciously or sadistically to cause harm. Thus, summary judgment in Defendants' favor is appropriate.

### B. **Failure to Intervene Claim**

Courts recognize a closely related Eighth Amendment cause of action based upon a failure to intervene when other prison officials use excessive force. According to the United States Court of Appeals for the Third Circuit, "a corrections officer's failure to intervene in a beating can be the basis of liability for an Eighth Amendment violation under §1983 if the corrections officer had a reasonable opportunity to intervene and simply refused to do so." Smith v. Mensinger, 293 F.3d 641, 650 (3d Cir. 2002). To state a valid cause of action "in a case where an inmate claims an officer had a duty to take reasonable steps to protect a victim from another officer's use of excessive force, the inmate must prove that (1) the

17

officer had a duty to intervene; (2) the officer had the opportunity to intervene; and (3) the officer failed to intervene." Knauss v. Shannon, No. 08-cv-1698, 2010 WL 569829 (M.D. Pa. Feb. 12, 2010) (citing Smith, 293 F.3d at 650–51). "Additionally, it is plaintiff's burden to adduce evidence of [these] requirements." Smith v. Donate, No. 10-cv-2133, 2012 WL 3537017, at *9 (M.D. Pa. June 15, 2012) (quoting Yarnall v. Mendez, 509 F. Supp. 2d 421, 433 (D. Del. 2007)). See also Gainor v. Douglas County, Ga., 59 F. Supp. 2d 1259, 1289 (N.D. Ga. 1998) ("[P]laintiff must proffer evidence that the officer in question had a reasonable opportunity to intervene.").

Here, the undisputed facts cannot establish a failure to intervene claim as a matter of law. The remaining Defendants had no duty to intervene, because at no point did any excessive force occur. Further, as the video tape evidence points out, the physical force used lasted only minutes, and thus, even if the force were excessive, Defendants lacked a "realistic and reasonable" opportunity to intervene. See Ricks v. Shover, 891 F.3d 468, 479 (3d Cir. 2018); Smith, 293 F.3d at 651. As such, the Court will grant summary judgment in favor of the remaining Defendants, and against Plaintiff on the failure to intervene claim.

18

## C. Personal Involvement

A plaintiff, in order to state an actionable civil rights claim, must plead two essential elements: (1) that the conduct complained of was committed by a person acting under color of law, and (2) that said conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. See Groman v. Township of Manalapan, 47 F.3d 628, 638 (3d Cir. 1995); Shaw by Strain v. Strackhouse, 920 F.2d 1135, 1141-42 (3d Cir. 1990).

Furthermore, federal civil rights claims brought under §1983 cannot be premised on a theory of *respondeat superior*. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). Rather, each named defendant must be shown, via the complaint's allegations, to have been personally involved in the events or occurrences which underlie a claim. See Rizzo v. Goode, 423 U.S. 362 (1976); Hampton v. Holmesburg Prison Officials, 546 F.2d 1077 (3d Cir. 1976). As explained in Rode:

> A defendant in a civil rights action must have personal involvement in the alleged wrongs.... [P]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity.

Rode, 845 F.2d at 1207.

19

Inmates also do not have a constitutional right to a prison grievance system. See Jones v. North Carolina Prisoners Labor Union, 433 U.S. 119, 137-138 (1977); Speight v. Sims, No. 08-2038, 2008 WL 2600723 at *1 (3d. Cir. Jun 30, 2008)(citing Massey v. Helman, 259 F.3d 641, 647 (7th Cir. 2001)("[T]he existence of a prison grievance procedure confers no liberty interest on a prisoner.")). Consequently, any attempt by Plaintiff to establish liability against a defendant solely based upon the substance or lack of response to his institutional grievances does not by itself support a constitutional due process claim. See also Alexander v. Gennarini, 144 Fed. Appx. 924, 925 (3d Cir. 2005)(involvement in post-incident grievance process not a basis for §1983 liability); Prvor-El v. Kelly, 892 F. Supp. 261, 275 (D. D.C. 1995) (because prison grievance procedure does not confer any substantive constitutional rights upon prison inmates, the prison officials' failure to comply with grievance procedure is not actionable).

With respect to Defendants Superintendent DelBalso, Deputy Superintendent Mason, Deputy Superintendent Cronauer and Security Lt. Biscoe, the Complaint generally contends only that they were aware of the December 14, 2016 incident and did not try to stop or protect Plaintiff.

Based on those vague assertions and the record which reveals the only involvement of these Defendants were through their involvement with Plaintiff's grievances, it is apparent that Plaintiff is attempting to establish liability against these Defendants based upon either their respective supervisory capacities or their review of his institutional grievances. Pursuant to the above discussion, either approach is insufficient for establishing civil rights liability against those Defendants and they are entitled to judgment as a matter of law.

Moreover, the daily rosters for December 14, 2016 reveal that Defendants Rakus and Clark[1] were not assigned to the RHU on December 14, 2016 and Defendants Cronauer and Biscoe did not work on December 14, 2016. (Doc. 37-16). Thus, providing further support for their lack of personal involvement in the December 14, 2016 incident.

---

[1] Plaintiff concedes that Defendants Rakus, and Clark should be dismissed from the above captioned action. (See Doc. 50 at 5-8).

21

## V. <u>Conclusion</u>

For the reasons set forth above, the Court will grant the Defendants'

motion for summary judgment.

A separate Order shall issue.


*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: March 22, 2022**

17-0771-01


22